The next case this morning is 522-0361 in the matter of the estate of Maxine E. Spitler, deceased. Arguing for the appellant is Emily Fitch. Arguing for the appellee, People's State Bank of Newton, is Frank Weber. Arguing for 12 other named appellees is James Neal. Each side will have 15 minutes for the argument. The appellant will also have 5 minutes for rebuttal. The appellees have agreed to split their time 10 minutes and 5 with Mr. Neal going first. Please note only the clerk is permitted to record these proceedings. Good morning. Mr. Neal and Mr. Weber, you've agreed to split your time. The court will not police the time. So if Mr. Neal goes over the 10 minutes, then that will cut into Mr. Weber's time. So just be aware of the clock. Can you see the clock? Okay. Yes. Okay. Yes. All right, we begin with Ms. Fitch for the appellant. When you're ready, you may proceed. Thank you. May it please the court, counsel? My name is Emily Fitch. I'm counsel for the appellants Kelly and Norma Jean Aldrich. There are essentially three issues, I think, that are brought before this court today. The first issue is that this 1965 Spitler joint will was not a valid and enforceable joint and mutual will. Second issue is that the trial court lacked the authority to determine the rights of the parties as to the 1965 joint will and the 2008 will and trust of Maxine Spitler. And third, that the trial court erred in finding that the 1965 Spitler will controlled the disposition of all assets of Maxine Spitler. The third issue has been argued in two parts. The first is that these after-acquired assets of Maxine Spitler, basically property that was acquired after John Spitler's death, specifically being, at least in this case, that we're addressing 73 acres, or 73.77 acres of farmland that was bequeathed to the appellants, we're not subject to or we're arguing we're not subject to the 1965 joint will. The second part of that third argument is that that bequest of the 73 acres was not contrary to the testamentary scheme of the 1965 joint will. For today's purposes, I'm just focusing on the last two issues in this, one being the trial court's lack of authority to make the rulings that it did as to the 1965 joint will. And second, that it erred in finding that Maxine Spitler's assets were subject to that 1965 joint will. With regard to the first argument that the trial court lacked the authority to rule on the disposition of assets as to this 1965 joint will, there are a few issues in that. The first is that- Ms. Fitch, let me interrupt you just one moment. When you say lacked the authority, are you saying that there was no subject matter jurisdiction? That was part of our argument, Your Honor. We also believe that the trial court went beyond the scope of authority that it had in determining the rights of the parties when this complaint for declaratory judgment was filed. Ms. Scherer, can you elaborate on your subject matter jurisdiction argument only because circuit courts obviously have the ability to administer probate? Yes, I think the issue here was that the 2008 will of Maxine Spitler was admitted to probate. I would argue that the court obviously had authority and subject matter jurisdiction over that, but when this 1965 will is filed as an exhibit to a complaint for declaratory judgment, I don't think the court had authority to rule as it did with regard to that without being properly admitted to probate or addressed by other means. A few of those would have been a will contest or the appellees could have filed something for breach of contract or arguing specific performance as to that 1965 joint will, and none of that was done. So I think the court, in ruling that Maxine Spitler went beyond the scope of her authority, essentially, in essence, admitted this 1965 joint will to probate without going through the proper means of doing that. Did your clients argue that in the trial court or was that argument forfeited? There was a motion to dismiss that was filed for lack of subject matter jurisdiction. The court denied that motion. I believe it was filed, and I think the employees pointed that out, it was filed after the appellants did file an answer to the complaint for declaratory judgment. Okay, thank you. I guess going along with that, really, I think what the appellees or appellees should have done would have been to file, like I said before, will contest, breach of contract, arguing for specific performance, and none of that was done. For those reasons, we believe that the trial court acted beyond the scope of his authority with regard to this complaint for declaratory judgment. The second argument or issue in this case is that we've got the trial court erred in holding that the 1965 joint will controlled the disposition of all of Maxine Spitler's assets. So, we have essentially two reasons why we would argue that the 73 acres of farmland was not subject to the 1965 joint will. First, there was a release and renunciation that was signed in 1985, indicating that the signatories, at least those that signed it, disclaimed any interest in the estate. And furthermore, Maxine Spitler was entitled to, at least at the time, a marital deduction of 50% of the gross estate, which we would argue that half of that estate would not have been subject to the terms of the 1965 joint will. The second argument is that the 73 acres of farmland was acquired after John Spitler's death and was not, therefore, not subject to the terms of the 1965 joint will. The Appellees, in their brief, and it's part of the trial court's ruling, they cite the case of Halderman v. Halderman. It's a 1931 Illinois Supreme Court case. I think this case is distinguishable for a number of reasons. For one, it does not really address joint mutual wills. It's based on old, outdated statutory law. The probate statute has changed many times since 1931. And third, the Supreme Court, this was a very fact-heavy case, the Supreme Court relied heavily on the interpretation of the language of the will. In this case, it's different. And if we're focusing on the actual language of the will, the 1965 joint will uses language, our, we, such as our property, referring to John Spitler and Maxine Spitler, the property, arguably the property that they had together at the time of his death. So when he passed away, that property became Maxine's property. But again, it was only the property, it was the value of the property that existed at the time of John Spitler's death. So as an example, if Maxine had purchased a lottery ticket for $5, then she wins the jackpot, wins $1 million. Now the question is, is that million dollars that she wins using that $5 from the estate, is that subject to the joint mutual will? I think the Appellees would say yes, we would say no. If that $5 is reimbursed to the estate, that the rest of that million dollars would not be subject to the estate or not subject to the joint will. And following along with that same train of thought, if Maxine Spitler was allowed to, with certain limitations at least, do what she wanted with these after-acquired assets of this million dollars, then she's not acting contrary to the testamentary scheme of the 1965 joint will. That was another issue that was addressed. In Illinois, law is pretty clear, and I think counsel for Appellees would even agree that when a joint mutual will is executed, the death of the first testator generally creates a life estate for the surviving testator or spouse. So, for example, upon John's death, if Maxine Spitler wanted to use some of that money for her own benefit, if she wanted to go to Disney World every year, she could do that with limitations because a life tenant does owe those certain fiduciary duties, such as not preventing waste, not manipulating title to defeat the interests of the remainder men, and not to transfer anything for inadequate consideration. Well, let me ask you this, though. With regard to that, I don't think the Appellees are arguing, and they can correct me if I'm wrong, and you can correct me if I'm wrong, that had Ms. Spitler used the money for her benefit, in other words, if she became, after her husband's death, a world traveler and decided to go to some exotic foreign place every year thereafter, and used up all of the ray of the estate, I don't know that that's objectionable, as opposed to having money left over after her death and bequeathing it outside of the terms of that original 1965 will. And I would agree with Your Honor that they're not arguing that anything that she did, I think, during her lifetime, if she took trips to Disney World, would be contrary to the testamentary scheme of the will. But I think following that same train of thought, if she can use that money to become a world traveler, can she not use the same money or, in fact, money that she's acquired since then, as she increased her wealth, use that money to buy a certain section of land? And as long as she's maintaining the value of the estate that existed upon John Spitler's death, she's not really violating any testamentary scheme of the will, as long as the years... Well, let's stop there for a second, because I think your opponents are highlighting the fact that she is, if she has testamentary control over any remaining assets that she owes a duty to her husband, if you will, and the beneficiaries under her husband or hers, mutual and joint will, that both the husband's family and her family will share in whatever's left. And if she parses it out in a different fashion, that's in violation of that original will. Whereas, if she simply uses it, the life estate allows her to use it however she wants, is my understanding. And I'm making this sound like a statement, and it's not. Please find the question in my statement, if you will, and enlighten me on it. But isn't that the essence of this problem? It's what she is doing with the assets that she acquired, however she may, whatever assets, my reading of the 65 will, and I think your opponents point this out, is that anything that is left after our deaths, the last of us to die, whatever is left in that estate goes split equally between the heirs of the husband and the wife, as opposed to, you get to spend whatever you want, that's fine. But if there's stuff left, and I don't think there's any expectation in the will, the original will, that she immediately ceased trying to be productive and earn more money than what she had at the time of her husband's death. So there's an expectation that she's going to somehow acquire more funds, I would think, after his death, and that those funds would still make up the corpus of what the couple was going to divide upon the last of them to die. So if you can address that jumbled thought, I'd appreciate it. Sure. And I think that goes to perhaps a difference in this interpretation of the language of the 1965 joint will. It does use the language, our, it isn't really clear, and I'll agree with that, that it's not entirely clear if it's the assets that existed at the time of John's death or the assets that existed at the time of Maxine's death. But when I think when it's using the language we or our, it would make sense that it would be at the time of the first testator's death, because after that, then it's not really our assets or we, it's just one person. And that's why we would argue that anything that she acquired after that, as long as it's not changing the overall value of the estate that existed at the time of John Spittler's death, is not subject to the will. And therefore, if she wants to transfer it and do something different with that property upon her death, it's not still not violating the testamentary scheme of the 1965 joint will. Well, in Mr. Neal's brief on page 14, it has a paragraph that says, you know, the 1965 joint will affirmatively shows from its language that the testators intended to pass all of the survivor's property owned at the time of his or her death. Using the plural pronouns we and our, the Spittler's pool, all of their property in a common fund with reciprocal request to the survivor of them. And upon the death of the survivor a gift and two equal shares of the respective families of the entire remainder of every kind and character, and wherever the same may be situated, as then may remain. Is that not an intention of the makers of that will to to whatever's left at the time of the last of them to die. Whatever that might be, get split. I would argue that if it were That would normally be the case, however, because Maxine Spittler was able to acquire additional wealth on top of that, that that would be the difference if she if she spent lots of money and had half of the estate left over, but she was using it to be a world traveler, then I don't think we would really have an argument that she can take a portion of that. And it wouldn't be subject to the will. Okay. Anything else justice barbarous. No, not this time. Thank you, Justice Welsh. No questions. All right, Miss Fitch your time has expired, you'll have a few moments after the other gentleman, make their argument. Mr. Neal and you have 10 minutes. You're on mute. Can you hear me now your honor. Yes, we can. Thank you, your honor, and may it please the court, I will address the appellants argument in regard to whether or not the trial court had the power or subject matter jurisdiction to consider the issues in this case. The trial court properly found that it did in fact have subject matter jurisdiction. The circuit courts have a general jurisdiction over all judiciable matters, except those that are reserved to the Supreme Court. Now, in this case, people state bank, who at the time was acting in dual capacities one as the trustee of the 1994 Spittler trust and the 2008 Spittler pro over will in those capacities, it filed a complaint for declaratory relief under section two dash seven one of the circuit court clearly has subject matter jurisdiction to hear a matter under for declaratory relief and section two day seven one expressly provides that declaratory relief can be had for the construction of various types of instruments, including wills and contracts and the court may determine the rights of the parties under those instruments. The, the bank properly raised this issue for declaratory relief, setting forth its capacity as the trustee and executor under the subsequent testamentary instruments of Maxine Spittler, as well as the will that had been executed by Maxine and her husband john, and that these instruments created a controversy as to who was entitled to the remaining assets of Maxine's pepper. So, the Spittler airs the appellees filed an answer that admitted the material allegations of this of this complaint, and in his prayer for relief sought specific relief themselves in the guise of asking the court to place a constructive trust upon those assets in the trust and the probate. Likewise, the appellants the Aldridge's filed an answer to the complaint, admitting the material allegations, admitting that there was in fact an actual controversy among the parties and requesting their own relief, which was that the terms of the subsequent Spittler trust be enforced in derogation of the rights of the leg 80s under the 1965 Spittler joint will. So the issues were joined. And as we indicate in our brief, I don't think there's any questions that are with subject matter jurisdiction, and to whatever extent the appellants are arguing that the declaratory action was an improper means or remedy. They waive that by filing their answer and seeking relief. In fact, it's our position that declaratory action was a proper means to dispose of these issues. There is no, there is no single remedy for this type of situation. If you the case law, it can be done through an action in equity for specific performance, it can be done through a contract action. The notion that there must be a will contest, I think, is simply not correct. And as we indicated in our brief, a will contest would not even have resolved many of the issues here simply because many of the assets had already been placed in the revocable trust during Maxine's lifetime. So contesting the 2008 pour over will would not even have provided an adequate remedy and a determination of all the issues here. In regard to the second issue that was raised by appellant and oral argument, this is essentially an argument that the joint will only controlled assets that may have been owned by either testator at the time of the first testator's death. There's been no case law cited in support of the notion that after acquired assets, at least in context of a joint will, are not subject to its terms. We cite the Holderman case simply because it sets forth the general rule that has been followed for years, that you look at the four corners of the instrument to determine what the intent of the parties were. And those same rules of construction apply to joint wills and wills by a single testator. We cite the case of the state of Arnold in that regard. So in other words, the court's going to look at what the intent of the testators were. And in the 1965 Spittler joint will, we believe that there's no question that the intent of the testators there was that all of their property, whether it was owned individually or jointly, was going to be disposed of pursuant to a common testamentary or dispositive scheme at the death of the second testator. The will itself uses the plurals we and our throughout. It refers to our property. It refers to all property of every kind and character, wherever situated. That language is looked at and emphasized by the courts in determining what the intent of testators are in a joint will. And it is clearly in the intent of the testators in that situation that all of the property, whether it's acquired before or after, is going to be divided pursuant to that common dispositive scheme. And as we indicate in our brief, a contrary interpretation would undermine what the intent is under a joint will. It was clearly the intent of John and Maxine Spittler that when they were both gone, because they had no children, one half was going to go to John's family and the other half to Maxine's family. The notion that the surviving testator could disrupt that by virtue of the fact that there is other property that is acquired after the testator's death, there is simply nothing in the document would indicate that it was the intent of these testators to limit that common dispositive scheme to only assets that were in existence at the time of John's death. Moreover, as again, as we indicate in our brief, it would establish a whole series of rabbit holes for a court to have to go down. The examples that were raised in oral argument, in other words, the appellant argues, well, what if Maxine spent $5 on a lottery ticket and won a million dollars? Well, she correctly notes that it is our position that that million dollars would be a part of the common dispositive scheme to be divided. What if the $5 came from John? In other words, where did that $5 come from? Was that an asset that was in existence before John's death? If it was, it would seem, even under appellant's argument, the million dollars would belong to the common estate. So, again, Let me stop you, Mr. Neal, for just a moment, right at that juncture. There was a charity that was funded by Mrs. Spittler with $600,000, as my understanding. No one challenged the expenditure to fund that charity. I'm curious as to why. If she's not allowed to give 73 acres away, how can she take $600,000 out of the funds to put a charity in her name together? Other than the obvious, you don't want bad karma by going after a charity. I understand that part of it. But with regard to, you know, does that give some sort of a, does that, you know, forfeit your claims against what she's doing with the 73 acres or whatever? Well, I think the most obvious difference there is those were inter vivos gifts made by Mrs. Spittler during her lifetime. The 73 acres was not an inter vivos gift to the Aldridge's. It was contained in a gift, a postmortem gift through the trust. So, in other words, the distinction here is she would have been free to give the 73 acres or whatever that amount is, 73, 74, whatever it is, to the Aldridge's during her lifetime. Had she done that on her deathbed, it would not have been an issue as opposed to doing it through her will and trust? No, I would not go that far, Your Honor. That is to say it gets to the intent of the, in other words, if there was a deathbed transfer or there was a transfer of that property, if the intent was to circumvent the contractual obligation, then I believe that inter vivos transfer could be overridden. The trial court was not tasked with that issue, and you are correct. The appellees here, the heirs, simply did not wish to contest inter vivos gifts that had been made by Maxine during her lifetime because, frankly, we would still be in the trial court arguing about whether or not these various inter vivos gifts that were made over the time of Maxine's life were intended to override or circumvent the joint will. But we are not conceding that those gifts necessarily were proper. That would have entailed an accounting suit against the trustee, the time involved. So, I mean, that was a strategic or that was a decision made by the appellants or, excuse me, the appellees in that regard. Their position was the assets that were remaining were subject to the terms of the 65 will and should be disposed accordingly. I believe my time is up, Your Honor. If there's any questions, I will now allow Mr. Weber to present his argument. Mr. Justice Barberis, do you have any other questions? Nothing. Justice Welch? No questions. All right. Mr. Weber, our clerk has given you the full five minutes in light of the questioning, so you may begin. You're on mute. Thank you. Thank you, Your Honor. I admit, please, the court, learned counsel. My name is Frank J. Weber. I'm the attorney for the People's State Bank of Newton in both its capacity as the independent representative of the 2008 will of the decedent Mrs. Spindler, which was a or is a pour-over will, as well as the successor trustee of her Revocable Living Trust, which was initially established in 1994, I believe. Basically, as you know from the pleadings, there are roughly 20 interested parties in this case. Some inherit both under the 1965 will. Some inherit only under the trust, which includes the pour-over will. And as we alleged in our complaint, a disagreement arose among the beneficiaries of both of those instruments, the 1965 will, as well as the living trust, as to the disposition of the assets there, which would be obvious. And so the bank, in its fiduciary capacity, of course, at some point in time, would be required to make a distribution of the assets that it was administering, both as independent representative and as trustee. It chose and did file in this complaint for declaratory judgment. As Mr. Neal pointed out, both parties responded to the complaint, admitting, number one, that there was a disagreement among the two different sides, that is, the beneficiaries of the 95 will or the 65 will and the trust, and that there was an actual controversy. The statute indicates that in the event there is an actual controversy among parties, then the court can make a determination as to the declaration of the rights of the parties. Keep in mind that the problem of the fiduciary here is getting the matter resolved. And, you know, the period of time that we were working with there basically was a minimum of six months for the administration of the probate estate. Obviously, many estates and trusts are not resolved in six months, but in any event, there was a timeframe that had to be dealt with. And so they did bring this action, I believe it was within two or three months of the probate of the will after they had determined that there was no agreement among the parties. I would point out that the statute also, Code of Civil Procedure, does sanction an action where a party could incur multiple liability or double liability here. Neither party, either the beneficiaries of the 1965 will or some or all of the trust beneficiaries actually initiated litigation in this case. So in order to avoid double jeopardy here, as an additional reason, this action was brought. I would point out that all of the parties, by their pleadings, seem to submit their cases and their factual and legal arguments to the court through this declaratory judgment action by their affirmative defenses, by the allegations they made and their answers. So essentially, it seems to me that all of the parties are seeking relief. Actually, I think if you'll note in their prayers, even in their appellate briefs, they want either the court to rule in favor of the 1965 will or in favor of the beneficiaries of the living trust. So the position of my client, the fiduciary here, is that in order for it to make distribution, and since there is a disagreement among the parties, that we need a court determination. And it certainly seems to be the appropriate remedy here to seek a declaration from the court under the declaratory judgment statute to resolve that. Thank you. Thank you, Mr. Weber. Any questions, Justice Welch? No questions. Justice Barberis? No, thank you. Okay. Ms. Fitch? Rebuttal? Thank you. I just wanted to address a few points made by Mr. Neal and then some of the questions by Justice Barberis. With regard to the first issue, as far as a single remedy for resolving issues with wills, Mr. Neal points out that the will contest is not the sole remedy. I agree with that. I just pointed out that that's one remedy for resolving the case that we have here. Another remedy was specific performance. The other thing I wanted to point out is that this 1965 joint will was never actually established by clear and convincing evidence as a valid joint and mutual will, which is required by law. So those were other issues that were never addressed in the trial court. Is that point addressed in your brief? It was. Okay. Just very briefly. And I know you have a list of things that you want to get to. I do have one question with regard to the renunciation of the will by several of the heirs to the 1965 will. In your opinion, does that prohibit any of their heirs from taking under that 1965 will? In other words, once they give up their right to inherit under it? We would argue that it did for those who signed. I think there were maybe two that did not. Okay. The second issue, just pointing out a few things. The court had asked about this after acquired property, that anything, this question of anything that Maxine Spittler got after John Spittler's death, whether that falls within the 1965 joint will, or if she disposes of that, does that violate the testamentary scheme of the will? One thing that I should have pointed out before is that the 73 acres of land was actually put into a trust. It was put into a trust, I think, over 10 years before Maxine Spittler's death. She did it while she was alive. It was the will, however, that just disposed of those assets within the trust. Mr. Neal talked about this deathbed intent, and we really didn't have that here. Maxine lived for more than 10 years after this transfer was made of the 73 acres. Arguably, she transferred it to a trust, or she could have transferred it to another person. I would say it wouldn't have been an issue in this case at all. And that's pointed out also when we're comparing this to the case of In re the estate of Erickson. In that case, we had a surviving testator, surviving spouse who transferred real estate five days before her death, sold property for $10 per parcel of land. And that's different because there was an obvious intent to avoid the testamentary scheme of the joint mutual will. In that case, here we don't have that. Here it was just a transfer into a trust to essentially do what she pleased with that property during her lifetime. And it was only the will that disposed of that trust. So I just wanted to make that distinction. That's actually all I have. Thank you. So just questions, just for clarification, with regard to my questioning, Mr. Neal, in regard to the, the charity that was funded by by Miss Butler. You're suggesting that there's no difference between her funding that was $600,000 during her lifetime, or her transferring the 73 acres into a trust during her lifetime. Right, that the that that the property was no longer under her control, if you will, I guess it's revocable trust though so she has some control left on it, but does that make a difference. The nature of the trust. I would argue, it doesn't, it was essentially transferred prior to her death and well before that so I don't think that I would argue the revocable nature of that does not matter. Thank you. Any further questions justice for bears. I don't believe so. Just as well. No questions. All right. Thank you all for your arguments here today this matter will be taken under advisement will issue an order in due course.